UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PATRICIA LONG,<br><br>    Plaintiff,<br><br>    v.<br><br>ROMAN CATHOLIC BISHOP OF PORTLAND d/b/a ROMAN CATHOLIC DIOCESE OF PORTLAND,<br><br>    Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
<u>**INJUNCTIVE RELIEF REQUESTED**</u>

NOW COMES the Plaintiff, Patricia Long (hereinafter "Plaintiff" or "Ms. Long"), by and through undersigned counsel, and complains against the Defendant, Roman Catholic Bishop of Portland d/b/a Roman Catholic Diocese of Portland (hereinafter, "Defendant" or "Diocese"), as follows:

<u>INTRODUCTION</u>

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.;* the Maine Family Medical Leave Requirement Act ("FMLR"), 26 M.R.S. §§ 844 *et seq.*

2. On October 31, 2014, the Diocese violated Ms. Long's rights under the MHRA and the ADA by terminating her employment because of disability (major depression) and because of Ms. Long's request and need for reasonable accommodations including a medical leave of absence and episodic, intermittent leaves of absence going forward.

1

## PARTIES

3. Ms. Long is a United States citizen residing in Bowdoinham, Maine.

4. Defendant is a corporation, the title of which is Roman Catholic Bishop of Portland.

5. The Diocese of Portland includes the entire state of Maine and is part of the Province of Boston.

6. As of September 10, 2015, the date when the Defendant submitted information about this matter to the Maine Human Rights Commission, the Diocese had 1088 employees.

## JURISDICTION

7. Defendant had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

8. Defendant had more than 15 employees working in the same workplace as Ms. Long in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

9. Defendant had more than 50 employees working within 75 miles of Ms. Long's work place in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

10. This Court has subject matter jurisdiction over Ms. Long's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

11. On about June 2, 2015, Ms. Long filed a timely Complaint / Charge of Discrimination against the Defendant alleging unlawful disability discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

12. On February 29, 2016, the MHRC issued a Notice of Right to Sue with respect to Ms. Long's state law claims.

13. On March 2, 2016, the EEOC issued a Notice of Right to Sue with respect to Ms. Long's federal law claims.

14. Ms. Long has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL DEMAND

15. Pursuant to Federal Rule of Civil Procedure 38(b), Ms. Long hereby demands a jury trial on all issues triable of right by jury.

## FACTUAL ALLEGATIONS

16. Before working for the Diocese as the Director of Development, Ms. Long was the Executive Director of the Catholic Foundation of Maine ("Foundation").

17. Ms. Long was hired by the Diocese as the Director of Development in December 2008 with an annual salary of $85,000.

18. At the time of Ms. Long's termination, her annual salary was about $94,000.

19. Ms. Long's direct supervisor was Msgr. Andrew Dubois.

20. Bishop Richard J. Malone departed in May 2012. He was replaced by Robert Deeley, who was installed as Bishop in February 2014.

21. As Director of the Development Office, Ms. Long's primary responsibility was for the success of all fund-raising efforts of the Diocese including schools and parishes. Ms. Long was also responsible for such things as policy formation, program creation, and office and systems management.

22. Ms. Long's job performance was more than satisfactory even when the economic depression and other circumstances beyond her control made fund-raising extraordinarily difficult.

23. In 2012, Ms. Long's office raised between 2.5 and 2.6 million dollars. In 2013, that increased to about 2.7 million dollars.

24. Ms. Long has struggled with depression and insomnia for six or seven years.

25. On July 14, 2014, Ms. Long's depression was so severe that she needed and requested a medical leave of absence. The Diocese acknowledged and granted her request for a medical leave of absence.

26. Ms. Long's request for and use of leave constituted a reasonable accommodation for purposes of the MHRA and ADA and protected medical leave for purposes of the FMLR and FMLA.

27. The Diocese granted Ms. Long's request for leave for purposes of the FMLR and FMLA.

28. On July 23, 2014, Ms. Long's PCP submitted a Certification of Health Care Provider in support of her request. Ms. Long's PCP indicated that she was prescribed medication and that her inability to focus and difficulty with memory prevented her from working at that time. Ms. Long's PCP indicated that the length of time she needed for leave depended on the severity of the flare-up of her symptoms. The PCP indicated that Ms. Long's condition would cause episodic flare-ups in the future. The PCP wrote, "Stress from work may worsen condition." When asked to estimate the frequency of flare-ups she would experience in the next six months, Ms. Long's PCP offered her best guess that Ms. Long would have one flare-up every three months and that each episode would last seven days.

29. The future leave reflected in the note from Ms. Long's PCP constituted a reasonable accommodation for purposes of the MHRA and ADA and protected medical leave for purposes of the FMLR and FMLA.

30. Elizabeth Allen from Human Resources asked Ms. Long's PCP to clarify the length of time she needed for her current and future leaves of absence. Ms. Long's PCP complied with Ms. Allen's request.

31. Ms. Long returned to work from her leave of absence on about September 2, 2014.

32. Ms. Long's depression and leave of absence did not diminish her effectiveness at her job. Her office raised 2.86 million dollars in 2014, an increase from previous years.

33. Nothing significant happened between the time Ms. Long returned to work and the date of her termination less than two months later. No one criticized her work. No one spoke to her about any need for change in her job performance or interactions with others.

34. It was a complete shock to Ms. Long when, on October 31, 2014, she was abruptly terminated.

35. Ms. Long was called to a meeting with Msgr. Dubois and Ms. Allen. Msgr. Dubois said, "We're terminating your employment here, effective immediately." Ms. Long asked why. He said, "We are taking a new direction. We're going to look for someone else." Ms. Long was incredibly hurt and angry and told them, "This is not the way you treat people."

36. To her knowledge, Ms. Long was the only person terminated when the Diocese allegedly went off in "a new direction."

37. The Diocese gave Ms. Long a severance package that included two month's salary, continued health insurance for one month and a letter of reference from Msgr. Dubois.

38. There was a continuing need for Ms. Long's work as Development Director to be performed.

39. The Diocese conducted a search for Ms. Long's replacement and David DiNapoli was hired as the new Development Director on July 27, 2015.

40. Although the Diocese did not give Ms. Long any warning that her job was in jeopardy and did not tell her why she was terminated, the Diocese identified four reasons for termination in response to the Complaint / Charge of Discrimination filed with the MHRC and EEOC.

41. The stated reasons for termination were never expressed to Ms. Long during her employment.

42. The first stated reason arose from a complaint made against Ms. Long by Ms. Long's administrative assistant ("AA") in March 2013.

43. Ms. AA had filed a grievance against Ms. Long alleging that Ms. Long threatened her. Ms. Long did not threaten Ms. AA and denied that she said what Ms. AA quoted her as saying. Ms. AA had been a friend of Ms. Long's for 10 years. Ms. Long hired Ms. AA to work for her at three different organizations. Ms. AA was a valuable employee and Ms. Long had no reason to threaten her. Ms. Long received a written warning from the Bishop for the incident. She respectfully disagreed that she did anything to warrant discipline and apologized.

44. Nothing was ever said to Ms. Long after the March 2013 warning that suggested that Ms. Long's job was in jeopardy because of Ms. AA's grievance.

45. The Diocese alleges that the warning issued to Ms. Long in March 2013 is evidence that Ms. Long created an environment in the development office that was not conducive to productive work. That allegation is false. The development office, under Ms.

Long's leadership, effectively managed a $43 million endowment campaign which points to an office that was very conducive to productive work.

46. The second stated reason given for Ms. Long's termination was her alleged inability to work effectively with co-workers and to manage the development staff effectively, resulting in a high rate of turnover in staff. The only evidence that supports this claim is a warning that was issued more than a year and a half prior to Ms. Long's termination.

47. Ms. Long did her best to work constructively with others and lead her staff.

48. At times Ms. Long worked with difficult or inept employees who did not meet expectations.

49. When Ms. Long faced challenges (which did not happen often), the Diocese and Ms. Long's supervisor provided little or no direction or help to solve the problem.

50. The Diocese has not specified which termination decisions made by Ms. Long were inappropriate or which resignations were supposedly because of her ineffective management.

51. Ms. AA was the only person who left Ms. Long's staff after June 2013.

52. Ms. AA resigned voluntarily months before Ms. Long's medical leave of absence began in July 2014.

53. No one raised any questions or concerns with Ms. Long when Ms. AA resigned.

54. Next, the Diocese alleged that there were "tensions" and "issues" with the Finance Office.

55. The allegation is misleading and pretextual.

56. Ms. Long had no "tensions" or "issues" working with the Controller, Laurie Downey, who works in the Finance Office. Ms. Long worked closely and collaboratively with Ms. Downey throughout her employment.

57. Ms. Long did have "issues" with Finance Director David Twomey. Mr. Twomey verbally assaulted Ms. Long in the Chancery parking lot in September 2012. Ms. Long filed an official complaint against Mr. Twomey with Msgr. Dubois.

58. Mr. Twomey's difficult behavior was a long-standing problem and Ms. Long felt that someone had to speak out against it. For example, Mr. Twomey did not return Ms. Long's telephone calls or answer emails on a regular basis. This type of behavior was not only a problem for Ms. Long but for other people in the Chancery and many of the priests and parish employees.

59. The Diocese also alleged that there were "tensions" and "issues" with the Catholic Foundation.

60. This allegation is also misleading and pretextual.

61. "Tensions" and "issues" with the Foundation had existed for at least a decade.

62. When Ms. Long became the Development Director for the Diocese, she developed a major plan that called for close cooperation between the Diocese and the Foundation.

63. The Foundation's board blocked efforts to work collaboratively with the Diocese's Development office, wishing to remain absolutely separate from the Diocese.

64. As Executive Director of the Foundation and later, as Development Director for the Diocese, Ms. Long tried to persuade the Foundation's board that it was not beneficial to the Foundation to be operated separately since both were working towards the same goals (supporting the Church) and working with the same donors.

65. In early 2012, Ms. Long met with Bishop Malone and Msgr. Dubois to discuss how to improve cooperation and collaboration with the Foundation. Ms. Long followed up through emails to Bishop Malone to find out his thoughts and to get some resolution but she never heard back from him on this matter.

66. The Diocese has alleged that "after the warning," Ms. Long did not "do her part" to engage in consistently effective, greater collaboration/cooperation with the Foundation and Catholic Charities.

67. This allegation is mysterious.

68. Ms. Long did not receive any warnings about her interactions with the Foundation and Catholic Charities.

69. Ms. Long was never told that her collaboration or cooperation with the Foundation or Catholic Charities was ineffective or in need of change or improvement.

70. The Diocese has alleged, falsely, that Ms. Long was unwilling to support all pastors in their fund-raising efforts. The Diocese accused her of favoritism, which is untrue.

71. Ms. Long had good relationships with all the priests. Ms. Long went out of her way to help them. She attended the clergy institute each year in order to foster those important relationships and to show her solidarity with each of them. Ms. Long even developed an Increased Offertory Program and implemented the program at three different parishes to help the priests with their serious financial needs. She took on this project with the support and approval of Msgr. Dubois. In her June 2013 Performance Evaluation, Msgr. Dubois commended Ms. Long for her "professional relationship with priests."

72. In the summer of 2014, Bishop Deeley asked Ms. Long to call priests who had not reached their fund raising goal. In spite of Ms. Long's need for a medical leave of absence from

July to September 2014, she did indeed call every priest who had not yet reached goal and offered a variety of options to help them reach goal.

73. A number of priests opted to send a summer letter seeking support from parishioners who hadn't yet given. (Ms. Long wrote two letters for them to choose from, prepared the mailing and sent it out for the pastors to make it easy for them to accomplish.) One priest wanted to hand sign each of his letters. Ms. Long provided that priest with the means to accomplish this. In other parishes, Ms. Long and the priests reviewed those donors who had not given yet and the priests made personal calls. Both approaches were effective means of soliciting these gifts.

74. The Diocese has alleged that Ms. Long was terminated due to the "lack of improvement" in the Annual Appeal and/or the failure of the Appeal to "bounce back" in the five years since the most recent capital campaign in 2008-2010. According to the Diocese, in spite of "repeated poor results" during those intervening years, Ms. Long just kept doing the same thing and getting the same disappointing results. The Diocese also alleged that Ms. Long dismantled many of the fundraising practices that were in place when the Appeal was yielding approximately $3.6 million per year in favor of alternate practices. The Diocese stated that at the time Ms. Long was discharged, she had only begun to reintroduce the earlier more successful techniques, but the changes were too little and too slow.

75. Some of the allegations in the previous paragraph are completely untrue; others are unfair and misleading.

76. The Diocese knows that the success of the annual Appeal does not rest only on the Development Director's shoulders. Any nonprofit's fund raising success rests on the shoulders of the leadership and requires the participation of all members of the organization.

77. Each year Ms. Long would review her plans for the Appeal with Msgr. Dubois. She kept Msgr. Dubois informed of her work throughout the year. The Bishop reviewed, approved and signed all the letters.

78. Ms. Long's work was never criticized by Msgr. Dubois or the Bishop. In fact, they indicated to Ms. Long that they had a favorable opinion of the work she was doing.

79. In Ms. Long's June 2013 Performance Evaluation, Msgr. Dubois wrote, "Your creative and artistic approaches to Development and promoting the annual Appeal are appreciated…"

80. The annual Appeal did not grow faster because the Diocese had asked people to give extraordinary and sacrificial gifts to the capital campaign and because many Catholic people who had been giving to the Appeal were hard hit by the economic recession. When people were forced to choose, they chose to support their parish and not the Diocese.

81. In addition, some priests were very unhappy with Bishop Malone and were not committed to the Appeal. Ms. Long knows this because they told her. This was a serious detrimental factor affecting the Appeal.

82. There was also considerable loss of major and other donors due to Bishop Malone's methodology in opposition to the same-sex marriage referendum.

83. It is untrue that Ms. Long dismantled many of the fundraising practices that were successful in the past.

84. When Ms. Long became development director, she adopted the same formula that had been used in the past and continued to use that formula.

85. Ms. Long also instituted important measures like a major gifts program that proved to be very successful and increased gifts from high-level donors each year she conducted the Appeal.

86. Ms. Long also increased outreach by adding a fall Appeal and a year-end Appeal which brought in significant funds.

87. Each year Ms. Long improved the quality of the Appeal. She carefully studied trends in fundraising especially in crafting a compelling case for support. Ms. Long worked very deliberately to increase the effectiveness of these messages and letters. She improved the messaging of the solicitation letters and, as is an essential fund raising practice, included specific requests for contributions based on individual giving history, something that hadn't been done before.

88. Ms. Long began the production of an annual report that told the Diocese's donors what programs and ministries their gifts supported, provided descriptions of each, and how much money was allocated. The annual report included a thank-you letter from the Bishop and emphasized the donors' contributions. This was a great deficiency of prior practices and was a factor that affected donors' giving when the recession hit. There had been very little effort to build relationships with donors so when hard times came, donors left.

89. Ms. Long also began a donor stewardship program which increased communications with donors to thank them and make them aware of what a difference their gifts made. Every year Ms. Long visited with donors around the state to thank them for their generosity and to learn more about things that were important to them. Every year, Ms. Long tried to get people to speak for the Appeal at parishes during the weekends in May. Ms. Long herself gave talks every year during the weekends in May at parishes that requested a speaker.

This demonstrates a significant commitment and dedication to the Appeal and the Diocesan fundraising work.

90.     In 2014, Ms. Long instituted an official speaker's bureau for the Appeal and had a group of 25 speakers. She even provided training for them conducted by one of the deacons who had a Ph.D. in public speaking. Those who attended said the trainings were very valuable and helped them feel more confident so that they could deliver a great talk.

91.     The Diocese's records will show that fundraising through the Annual Appeal and otherwise increased under Ms. Long's direction in spite of the internal and external forces that worked against the Diocese at the time, all of which was beyond Ms. Long's control.

92.     Ms. Long is a qualified individual with a disability (chronic, major depression).

93.     Ms. Long's major depression is a per se disability under the MHRA.

94.     Ms. Long's major depression substantially limited major life activities for purposes of the ADA and MHRA including the major life activity of sleeping.

95.     Ms. Long's major depression is also a long term, chronic condition "serious health condition" under the FMLR and FMLA as it has required periodic visits for treatment by a health care provider, has continued over an extended period of time, and causes episodic periods of incapacity.

96.     Ms. Long requested and needed a reasonable accommodation in the form of a medical leave of absence from July 23 to September 2, 2014.

97.     Ms. Long requested and needed reasonable accommodations going forward in the form of intermittent leaves of absence.

98.     Shortly after the Diocese learned of Ms. Long's disability and her request and need for reasonable accommodations, the Diocese terminated Ms. Long's employment.

99. The Diocese's stated reasons for termination are untrue and pretextual.

100. The reasons for Ms. Long's termination have shifted over time. On the day that Ms. Long was terminated, the Diocese stated that the reason was that it was going in "a new direction." After Ms. Long was terminated, the Diocese produced multiple reasons for termination that relate exclusively to events that occurred before the Diocese knew of her disability and need for reasonable accommodation.

101. The real reason the Diocese terminated Ms. Long is due to disability discrimination, an unwillingness to provide Ms. Long with reasonable accommodations going forward, and retaliation for exercising her rights under the MHRA and ADA.

102. The temporal proximity between Ms. Long's use of protected medical leave and her termination is evidence of a causal connection.

103. The Diocese knowingly and willfully violated Ms. Long's rights under the ADA, MHRA, FMLA and MFMLR.

104. The Diocese unlawfully discriminated against Ms. Long with malice or reckless indifference to her rights.

105. As a result of the Diocese's unlawful discrimination against Ms. Long, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

106. Ms. Long has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by the Diocese unless and until the Diocese is enjoined by this court.

## COUNT I: MHRA- DISABILITY DISCRIMINATION

107. Paragraphs 1-106 are incorporated by reference.

108. Defendant's conduct violated the MHRA's prohibition on disability discrimination.

### COUNT II: MHRA- FAILURE TO ACCOMMODATE

109. Paragraphs 1-108 are incorporated by reference.

110. Defendant violated the MHRA by failing to effectively accommodate Plaintiff's disability.

### COUNT III: MHRA-RETALIATION

111. Paragraphs 1-110 are incorporated by reference.

112. Defendant's conduct violated the MHRA's prohibition on retaliation.

### COUNT IV: ADA-DISABILITY DISCRIMINATION

113. Paragraphs 1-112 are incorporated by reference.

114. Defendant's conduct violates the ADA's prohibition on disability discrimination.

### COUNT IV: ADA-FAILURE TO ACCOMMODATE

115. Paragraphs 1-114 are incorporated by reference.

116. Defendant's conduct violated the ADA by failing to effectively accommodate Plaintiff's disability.

### COUNT VI: ADA-RETALIATION

117. Paragraphs 1-116 are incorporated by reference.

118. Defendant's conduct violated the ADA's prohibition on retaliation.

### COUNT VII: FMLA

119. Paragraphs 1-118 are incorporated by reference.

120. Defendant violated Long's prescriptive and proscriptive rights under the FMLA.

### COUNT VIII: FMLR

121. Paragraphs 1-120 are incorporated by reference.

122. Defendant violated Long's prescriptive and proscriptive rights under the MFMLR.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a) Declare the conduct engaged in by Defendant to be in violation of her rights;

(b) Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

(c) Order Plaintiff to reinstate her in her former position;

(d) Award equitable-relief for back pay, benefits and prejudgment interest;

(e) Award compensatory damages in an amount to be determined at trial;

(f) Award punitive damages in an amount to be determined at trial;

(g) Award liquidated damages in an amount to be determined at trial;

(h) Award nominal damages;

(i) Award attorney's fees, including legal expenses, and costs;

(j) Award prejudgment interest;

(k) Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

(l) Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

(m) Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n) Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA, FMLA, and FMLR;

(o) Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant failed and refused to provide her with reasonable accommodations and constructively discharged her because of her disability; and

(p) Grant to Plaintiff such other and further relief as may be just and proper.


Dated: March 31, 2016                             */s/* Chad T. Hansen
                                                  chansen@maineemployeerights.com

                                                  */s/* Peter Thompson
                                                  pthompson@maineemployeerights.com


                                                  Attorneys for the Plaintiff

                                                  MAINE EMPLOYEE RIGHTS GROUP
                                                  92 Exchange Street 2nd floor
                                                  Portland, Maine 04101
                                                  Tel. (207) 874-0905
                                                  Fax (207) 874-0343